13

FILED
AUG 27 2014
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
TJOF

POSTED ON WEBSITE

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re<br><br>Thomas Eric Dekoning and Jo Ann Dekoning,<br><br>Debtors. | Case No. 13-16634-B-13<br><br>DC No. GH-1 |

**MEMORANDUM DECISION REGARDING DEBTORS' MOTION TO VALUE COLLATERAL OF CALIFORNIA BANK & TRUST**

Gary L. Huss, Esq., appeared on behalf of the debtors, Thomas Eric Dekoning and Jo Ann Dekoning.

Susan A. Hemb, Esq., of Hemb Law Group, appeared on behalf of California Bank & Trust.

Before the court is a motion (the "Motion") filed by the debtors, Thomas and Jo Ann Dekoning (the "Debtors") to value the collateral of California Bank & Trust ("Cal Bank"). Cal Bank holds a loan secured by a second priority trust deed (the "Cal Bank Lien") against the Debtors' residence located in the Sierra foothill community of Auberry, California (the "Property" or the "Residence"). The Motion is supported by a declaration from Thomas Dekoning (the "Debtor"), stating his opinion that the Property was worth $400,000 at the commencement of this case (the "Debtor Declaration"). The Debtor offered no other information regarding the attributes and condition of the Property.

The Debtors contend that the fair market value (the "FMV") of the Residence at the commencement of the case was less than the debt secured by the first priority trust

deed. If true, then the Cal Bank Lien would be wholly unsecured and the Debtors could provide for Cal Bank's claim through their chapter 13 plan as a general unsecured claim pursuant to the authority of *Zimmer v. PSB Lending Corporation (In re Zimmer)*, 313 F.3d 1220-1227 (9th Cir. 2002) and *Lam v. Investors Thrift (In re Lam)*, 211 B.R. 36, 40-41 (9th Cir. BAP 1997). The Debtors and Cal Bank offered competing appraisals prepared by competent and experienced appraisers. For the reasons set forth below, the Motion will be denied in so far as it seeks a determination that Cal Bank's claim is wholly unsecured.

This memorandum decision contains the court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), made applicable to this contested matter by Federal Rules of Bankruptcy Procedure 7052 and 9014(c). The court has jurisdiction over this matter under 28 U.S.C. § 1334, 11 U.S.C. § 506[1] and General Orders 182 and 330 of the U.S. District Court for the Eastern District of California. This is a core proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A) & (L).

**BACKGROUND AND FINDINGS OF FACT.**

**The Residence and the Conservation Easement.** The Residence is built on a parcel of property, approximately 4.52 acres, located in the Sierra foothills. It is identified on the parcel map as Lot 22 in a gated community (PUD) known as Old Ranch Park. According to Cal Bank's appraiser, all of the houses in Old Ranch Park are custom built and of high quality. The Debtors acquired the Property in or about March 2005 through an escrow handled by Chicago Title Company. The Residence consists of two structures with a gross living area totaling approximately 3,072 square feet. The first structure is a seven-room house with three bedrooms, three bathrooms, a three-car garage,

---

[1]Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated *after* October 17, 2005, the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23.

a patio, a deck, and two fireplaces. The second structure is a guest house with an attached workshop. The Debtor was previously a contractor and he had the residential structures custom built after acquiring the Property in 2005. It is not known what the Debtors originally paid for the Property, or how much they spent on construction of the Residence, but the Debtors had the Residence and underlying Property appraised at approximately $900,000 when they obtained the loan from Cal Bank in 2007.[2]

Debtors' exhibit 8 is a copy of the title report from Chicago Title which discloses numerous Covenants, Conditions & Restrictions ("CC&Rs") and easements recorded against the Property. One of those easements was granted to Sierra Foothill Conservancy, a land trust, and recorded on May 15, 1997 (the "Conservation Easement"). Debtors' exhibit 5 is a copy of the Conservation Easement Deed which describes the Conservation Easement. Basically, the Conservation Easement imposes restrictions on the access and use of property extending on both sides of Big Sandy Creek and an "intermittent drainage" which cross the Property and several other parcels in the Old Ranch Park subdivision. The Conservation Easement is described in the Deed as:

> Minimum buffer widths shall be 100 feet from the high water line on both sides of Big Sandy Creek, and 50 feet from the high water line on both sides of the unnamed drainage.

The California Department of Fish and Game ("DF&G") has jurisdiction to supervise and enforce the Conservation Easement. The Debtor testified that DF&G patrols the Conservation Easement on a regular basis and issues fines for violations. The Conservation Easement is accessible for use and enjoyment by foot, however, the Debtor was once fined $10,000 for driving a tractor upon the Conservation Easement to get sand for some purpose in connection with his use of the Property.

**The Water System.** Water for the Residence and surrounding landscaping is supplied by a well and pump system. The Debtor Declaration makes no reference to any problems with the water system. At trial, however, the Debtor testified that the water

---

[2]The Debtors' appraiser also prepared the $900,000 appraisal for the 2007 loan.

supply has diminished to the point that some of the trees and landscaping have died from lack of water and that the house is now using nonpotable water from a storage tank reserved for fire protection. The Debtor testified that the well started accumulating sand sometime in 2011 and that the sand has eroded the pump and significantly reduced the pump's output. The Debtor testified that the water situation could not be resolved without a new well. However, Debtors' exhibit 9, a "Water System Repair Estimate" from Auberry Builders Supply, Inc., dated March 20, 2014, states that the entire pump system, including 420 feet of pipe, can be replaced for approximately $5,840 (the "Well Repair Estimate").

**The Senior Debt.** The Residence is encumbered by two mortgage liens. The first trust deed is held by Wells Fargo Bank, N.A. ("Wells Fargo"). Wells Fargo filed a proof of secured claim two months after commencement of the case in the amount of $407,158.78 (the "WFB Claim"). The parties stipulated at the beginning of the evidentiary hearing to accept the WFB Claim as evidence of the senior debt against the Residence. There was no evidence offered of any other senior debt such as property taxes, assessments, or judgment liens, etc. For purposes of this decision, the senior debt against the Residence will therefore be fixed at $407,158.78.

**The Debtors' Appraisal.** In support of their Motion, the Debtors initially offered the Debtor Declaration stating that the Residence was worth $400,000. The Debtor Declaration was based on an appraisal prepared in December 2011 by the Debtors' expert witness Mary King ("King"), an experienced and licensed real estate appraiser who specializes in appraising residential properties in the Sierra foothills.[3] In preparation for the evidentiary hearing, the Debtors offered a second appraisal prepared by King in December 2013 wherein she appraised the Property at $405,000. King's appraisal was based solely upon an exterior examination of the Property and a conversation with the

---

[3]The parties stipulated at the evidentiary hearing that both appraisers were competent to testify as expert witnesses and to give an opinion of the Property's value.

Debtor. King did not inspect the interior of the Residence and she miscounted the number of rooms in the house; the appraisal states that the house has six rooms but it actually has seven. King noted that the quality of the construction was "above average" and described it as a "beautiful custom house."

When King visited the Property, she did not notice any adverse site conditions. She was not made aware of any problems with the water system, but testified that such a problem would have to be disclosed in a sale of the Property. She did not do any research to determine if there were restrictions on use of the Property and she was not familiar with the Conservation Easement or what it meant. She acknowledged that she was not qualified to testify as to the Easement's affect on the value of Property.

After King explained the basis for her appraisal at $405,000, the Debtors' counsel essentially tried to impeach his own witness. He questioned King extensively about the water system and the Conservation Easement. After she acknowledged being unaware of any water problem, and having absolutely no familiarity or experience with Conservation Easements, she was led by Debtors' counsel, through a series of hypotheticals, to conclude that she probably would not pay more than $250,000 for the Property.

**The Debtor's Testimony.** When the Debtor took the witness stand, it soon became apparent that he had a grudge against the DF&G over its enforcement of the Conservation Easement. The Debtor's negative opinion about the Conservation Easement was based on subjective factors related to his personal history with, and goals for use of, the Property. There was no objective testimony about the effect of the Conservation Easement on the FMV of the Property.

With regard to the water system, the Debtor testified that the well needed to be completely replaced before the Property would have a source of potable water. This directly contradicted his own evidence which showed that the water system could be repaired for less than $6,000. After the attorneys had an opportunity to question and cross-examine the Debtor, the court asked him about his Declaration in support of the Motion stating that the Property was worth $400,000. The Debtor confirmed that he

knew about all of the easements on the Property when he purchased it in 2005. The court asked the Debtor to articulate specifically when and why he had so radically changed his opinion of the Property's value. In response, the Debtor stated that his opinion of the Property's value had changed "within the last week" before the trial.

With regard to the Conservation Easement, the Debtor acknowledged that he was aware of the Easement when he purchased the Property in 2005, but that he misunderstood the scope and application of the Easement at the time. The Debtor acknowledged that the Conservation Easement was accessible for occasional pedestrian access, but later contradicted himself by stating that he cannot do anything on the Easement but "look at" it. He testified that only 1.18 acres of his Property are not restricted in one form or another.[4]

**Cal Bank's Appraisal.** Conversely, Cal Bank contends that the Residence had a FMV of approximately $485,000 at the time the case was filed.[5] Cal Bank offered the appraisal and testimony of Robert McCauley ("McCauley"), another licensed and experienced real estate appraiser who specializes in the appraisal of residential properties. McCauley visited the Property twice. During the first visit on November 7, 2013, McCauley performed an exterior-only inspection and appraisal. (Cal Bank's exhibit B.) The Debtor mentioned nothing about the water well problems or the Conservation Easement even though he had an incentive to inform McCauley of those negative factors.[6] McCauley noted an extensive drip irrigation system and did not see any dead vegetation

---

[4]The Property is also subject to CC&Rs executed by the original developer in 1997 and various easements for utilities and fire access. All of the easements and restrictions were disclosed in the title report when the Debtors purchased the Property. (Exhibit 8.)

[5]Cal Bank filed a proof of claim in the amount of $260,204 based on a promissory note for $220,000 dated February 23, 2007. Cal Bank's proof of claim estimates a value for the Residence to be $487,000.

[6]On both visits to the Property, McCauley visited with the Debtor for about 30 minutes. On the first trip, the conversation focused on the weather and Debtor's family.

on the Property. With regard to the Conservation Easement, McCauley, like King, had no experience with similar easements and was unable to testify as to what negative effect, if any, the Conservation Easement might have on the property. Using the "sales comparison approach," he compared the Property to four comparable properties, or "Comps," all of which had sold recently for between $415,000 and $460,000. McCauley noted that the Residence had seven rooms, a three-car garage, a large workshop and a small guest house. Perhaps the most similar Comp was Comp 1, an eight-room house located about 1/4 mile from the Residence, on the same road in the same gated subdivision.[7] Comp 1 sold recently for $455,000. It had only a two-car garage and did not have a guest house. After making appropriate adjustments based on the different features, McCauley initially valued the Debtor's Property at $470,00.

On or about January 15, 2014, McCauley returned to the Property and, unlike King, conducted an interior inspection of the structures. He testified that the interior was much nicer than he had originally assumed. He was "impressed" with the "high quality" and the "professional grade appliances." He observed that the house had seven rooms, as opposed to the six rooms in King's appraisal, and gave the custom-built home very favorable comments with regard to the quality of construction and the interior features. Using the same Comps, McCauley increased his appraisal to $485,000. (Cal Bank's Exhibit C.) The most significant adjustment to value related to the workshop and the guest quarters on the Property. McCauley testified that they were very well built and he increased the value of those two amenities by $15,000. McCauley's appraisal makes no mention of, or adjustments for, any problems with the water system or the Conservation Easement. Again, the court infers that the Debtor did not mention those issues to McCauley at the time of the second visit.

///

[7]McCauley's appraisal states, "Most weight is given Comp 1 due to its recent sale, its proximity to the subject, and due to it requiring the least gross adjustment."

**ISSUES PRESENTED.**

The Motion is described as a motion to value Cal Bank's collateral, but that title is a misnomer because the actual value of the Property is irrelevant to the outcome of this contested matter. The Debtors are actually asking this court to rule, based on the evidence, that the Cal Bank Lien is wholly unsecured and that the Cal Bank claim may be treated as a general unsecured claim, instead of a secured claim, in the Debtor's chapter 13 plan.[8] If the Cal Bank Lien is determined to be wholly unsecured, then Cal Bank is not the "holder of a secured claim" whose rights are subject to the "antimodification" protection of § 1322(b)(2).[9] *In re Zimmer, supra*, 313 F.3d at 1227. Unless the Cal Bank Lien is wholly unsecured, the plan must provide for full payment of Cal Bank's $260,204 claim as a secured claim.[10] If Cal Bank's claim is treated as a general unsecured claim, then Cal Bank will receive nothing on account of its claim through the Debtors' chapter

---

[8]This is not the first time the parties have battled this issue. The Debtors filed a prior chapter 13 bankruptcy petition in March 2009 (Case No. 09-11737-A-13). In those schedules, they listed the value of the Residence at $405,000. Attached to their modified chapter 13 plan was a motion to value Cal Bank's collateral at $400,000. That motion was supported by declarations from both Debtors, and an appraisal from Kay Austin Appraisals, all stating that the Property was then worth $405,000. Cal Bank responded with evidence from Susan D. Kraemer, a certified real estate appraiser, that the Property was worth $525,000. The matter was initially set for trial in July 2009. However, the parties ultimately settled the issue, in a stipulation which was filed in January 2010, by agreeing that Cal Bank would have a secured claim for $50,000. The Debtors' second modified plan was confirmed in December 2009, however, the Debtors stopped making plan payments in late 2011 and the case was dismissed in March 20012 on the trustee's notice of default and motion to dismiss.

[9]Section 1322(b) provides in pertinent part:

> Subject to subsections (a) and (c) of this section, the plan may –
>
> . . .
>
> (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence . . . .

[10]Bankruptcy Code § 1322(b)(2) prevents the Debtor from bifurcating or "stripping down" the Bankers' claim to a partially secured and partially unsecured claim based on the value of its collateral. *Nobelman v. American Sav. Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

13 plan and the Debtors will receive a discharge of their debt to Cal Bank upon completion of the plan.[11]

For purposes of granting or denying the Motion, this court does not need to determine the actual value of the Property. It only needs to decide whether or not the value of the Property, at the commencement of this case, was greater than, equal to, or less than, $407,158.78, the amount of the senior secured debt owed to Wells Fargo.[12] *In re Serda*, 395 B.R. 450, 453 (Bankr. E.D. Cal. 2008). In other words, the court only needs to decide if the value of the Property was $7,159 (1.79%) more than the amount stated in the Debtor Declaration, and $2,159 (0.53%) more than the amount appraised by King.

**ANALYSIS AND CONCLUSIONS OF LAW.**

**Applicable Law.** The Debtors seek to value Cal Bank's interest in the Property based on § 506(a)(1), which states:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.* (emphasis added).

When the debtors intend to stay in their house, the proper valuation of the house under § 506(a) is the FMV. *Taffi v. United States of America (In re Taffi)*, 96 F.3d, 1190,

---

[11]On August 1, 2014, an order was entered confirming the chapter 13 plan originally proposed by the Debtors. That plan provides for payment of Cal Bank's secured claim (valued at $0 ) in Class 2. However, confirmation of the plan does not constitute an adjudication of the value of Cal Bank's collateral. Based on this ruling, the plan needs to be modified to either cure the default and pay Cal Bank's secured claim according to its terms (Class 1) or surrender the Property to Cal Bank (Class 3). The Debtor's chapter 13 plan provides for a 0.7% dividend to the general unsecured creditors.

[12]The parties stipulated at the evidentiary hearing that the proper date for making the value determination was the date of commence of the case.

1192 (9th Cir. 1996). The FMV is not the "replacement" value because the house is not being replaced. Neither is it the "foreclosure" value because no foreclosure is intended in the chapter 13 plan. *Id.* The FMV is "the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time." *Id.*

**The Burden of Proof.** The debtors bear the initial burden of proof of overcoming any presumption established by the stated value in the secured creditor's proof of claim. The secured creditor has the ultimate burden of persuasion to demonstrate by a preponderance of the evidence the value of the collateral which secures its claim. *In re Southmark Storage Associates Ltd. Partnership*, 130 B.R. 9, 10 (Bankr. D.Conn. 1991).

The Debtors are currently living in the Residence and intend to stay there. They have the option in chapter 13 to surrender the Residence, however their chapter 13 plan provides that they will continue to make the mortgage payments to Wells Fargo outside of the plan. The "purpose of the valuation" and the "proposed disposition or use" of the Residence is to determine its value as an owner-occupied property. (§ 506(a)(1).) Generally, owner-occupants will try to realize the highest and best price for their property in an open market, which illustrates the inherent contradiction in this kind of proceeding. Although the Debtors intend to retain and live in the Residence, their goal here is to present the Property in the worst light possible and to seek its lowest valuation.

The court is essentially being asked to weigh two conflicting sets of testimony and evidence and decide which is the most believable. As the trier of fact, the bankruptcy court is entitled to evaluate a witness's credibility and to determine whether to believe the testimony or not. *Beauchamp v. Hoose (In re Beauchamp)*, 236 B.R. 727, 731 (9th Cir. BAP 1999), *aff'd mem.* 5 F. App'x 743 (9th Cir. 2001). "When the testimony of a witness is not believed, [the bankruptcy court, as] the trier of fact[,] may simply disregard it." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984). Here, the Debtors offered an appraisal prepared by King which, had the court believed her testimony, would have supported a ruling in the Debtors' favor. However, the fact that

King did not inspect the interior of the Residence, coupled with the Debtor's enthusiastic effort to introduce the "Conservation Easement" and the "water well" factors into the conversation, and to impeach King's testimony, resulting in King's unwillingness to stand by her own appraisal, seriously undermine the weight of her testimony.

**Application of the Facts.** The Debtors' case began well, with a sworn declaration from the Debtor, corroborated by a professionally prepared appraisal from King, but then the Debtor's testimony became difficult to believe. It is clear that the Debtors knew about the Conservation Easement when they purchased the Property in 2005, and when they valued the property at $900,000 for the purpose of soliciting a loan from Cal Bank in 2007. They also knew about the Conservation Easement, and had been living with it for seven years, when the Debtor gave his opinion that the Property was worth $400,000. Although the Debtor may be unhappy with the Conservation Easement and the DF&G, his belated effort to discredit the Property at trial was unpersuasive.

The Conservation Easement may be a source of aggravation to the Debtor, based on his personal experience and goals for the Property, but that does not mean that another buyer, with the same information the Debtors had, would not view the Easement as an asset to be enjoyed. Indeed, King even acknowledged on cross-examination that the presence of surface water on a parcel of property generally increases the property's value. The fact that the Debtor never mentioned the Conservation Easement to either appraiser, coupled with the fact that neither appraiser was familiar with or recognized the Conservation Easement as a detriment to the Property's value, gives further support to the conclusion that its impact was objectively minimal. It is difficult for this court to believe that, if the Debtors were trying to sell the Property, they would have anything derogatory to say about the Conservation Easement, or that they would disclose anything with regard to the water system other than the Well Repair Estimate.

**CONCLUSION.**

As noted above, the court only needs to find that King undervalued the Property by $2,159 or about 1/2% of the amount stated in her appraisal. The court is persuaded that

King's appraisal and subsequent testimony understated the FMV for the Property, if for no other reason than the fact that she did not actually inspect the interior of the Residence. Based on Cal Bank's appraisal of $487,000, the difference in the manner in which that appraisal was conducted, and the credible testimony of its expert witness, the court is persuaded that the FMV of the Property at the commencement of this bankruptcy case was greater than the amount of the first priority secured debt. Even if McCauley's appraisal overstates the FMV by thousands of dollars, it is still persuasive evidence that Cal Bank's secured claim is at least partially secured and is entitled to the protection of § 1322(b)(2). Accordingly, the Motion will be denied. The Debtors shall have 14 days to file a modified chapter 13 plan which provides for Cal Bank's secured claim in compliance with the Bankruptcy Code.

Dated: August 27, 2014

W. Richard Lee
United States Bankruptcy Judge

## Instructions to Clerk of Court

**Service List - Not Part of Order/Judgment**

The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below. The Clerk of Court will send the Order via the BNC or, if checked_____, via the U.S. mail.

Debtor(s), Attorney for the Debtor(s), Bankruptcy Trustee (if appointed in the case), and _X__ Other Persons Specified Below:

Susan A. Hemb, Esq.
Attorney at Law
1530 E. Shaw Avenue, Suite 104
Fresno, CA 93710

Michael A. Lanphere, Esq.
Attorney at Law
400 N. Tustin Avenue, Suite 225
Santa Ana, CA 92705

Office of the U.S. Trustee
U.S. Courthouse
2500 Tulare Street, Suite 1401
Fresno, CA 93721